**EXHIBIT A
(PART 1 OF 2)**

1  Rosemary M. Rivas (SBN 209147)
   Alyssa Dang (SBN 292995)
2  **FINKELSTEIN THOMPSON LLP**
   One California Street, Suite 900
3  San Francisco, CA 94111
   Tel: (415) 398-8700
4  Fax: (415) 398-8704
   Email: rrivas@finkelsteinthompson.com
5          adang@finkelsteinthompson.com

6  Joseph N. Kravec, Jr. (*pro hac* to be filed)
   McKean J. Evans (*pro hac* to be filed)
7  **FEINSTEIN DOYLE**
       **PAYNE & KRAVEC, LLC**
8  429 Forbes Avenue
   Allegheny Building, Suite 1705
9  Pittsburgh, PA 15219
   Tel.: (412) 281-8400
10 Fax: (412) 281-1007
   Email: jkravec@fdpklaw.com
11         mevans@fdpklaw.com

12 *Counsel for Plaintiffs and the*
   *Proposed Class*
13

**F I L E D**
Superior Court of California
County of San Francisco

AUG 26 2015

CLERK OF THE COURT
BY: _____
        DENNIS TOYAMA
                  Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

14

### COUNTY OF SAN FRANCISCO

15

16 LINDA CHESLOW and MIKE
   XAVIER, on behalf of themselves and
17 all others similarly situated,

18              Plaintiffs,

19              vs.

20 MARS, INCORPORATED and MARS
   CHOCOLATE NORTH AMERICA,
21 LLC,
22              Defendants.

CASE NO. C G C - 1 5 - 5 4 7 6 3 1

**CLASS ACTION**

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

23
24
25
26
27
28

CLASS ACTION COMPLAINT; Case No.:

1   Upon personal knowledge as to their own acts and status, and based upon their investigation,

2   their counsel's investigation, and information and belief as to all other matters, Plaintiffs Mike

3   Xavier and Linda Cheslow ("Plaintiffs"), on behalf of themselves and all others similarly situated,

4   allege as follows:

5   **INTRODUCTION**

6   1.      This is a consumer class action seeking declaratory and injunctive relief to restrain

7   Defendants Mars, Incorporated and Mars Chocolate North America, LLC (collectively "Mars" or

8   "Defendants") from continuing to sell in California ice cream products, as identified herein, that

9   contain artificial flavors, but which omit the "Artificial Flavor Added" statement on the principle

10  display panel of its labels as required by Food and Drug Administration ("FDA") regulations.  This

11  identical conduct also violates California's Sherman Law, which expressly adopts the FDA

12  regulations. *See* Cal. Health & Safety Code §§ 109930, 110100 and 110760.

13  2.      Mars labels each Product "Vanilla Flavored Ice Cream," "Coffee Flavored Ice

14  Cream" or "Vanilla and Chocolate Flavored Ice Cream."  Under governing FDA regulations detailed

15  herein, "flavored" ice cream must also affirmatively disclose "Artificial Flavor Added" on the

16  portion of the label most prominently displayed to consumers (known as the "Principal Display

17  Panel" or "PDP;" 21 C.F.R. § 101.1).  *See* ¶¶ 19-20, *infra* (citing 21 C.F.R. §§ 135.110(f)(2)(ii)

18  (requiring "Flavored" disclosure) and 135.110(f)(3)(i) (requiring "Artificial Flavor Added"

19  disclosure").  Thus, by labeling ice cream products as "Flavored," Mars admits these products must

20  also affirmatively disclose "Artificial Flavor Added" on their PDP.

21  3.      Mars violates this requirement by failing to disclose "Artificial Flavor Added" on the

22  Products' PDP.  Instead, Mars buries its disclosure of artificial ice cream flavors in the Products'

23  ingredients list on the back of the Products' packaging.  This violates federal and California law and

24  misleads consumers.  Mars's ice cream products labeled as "Flavored" but omitting the "Artificial

25  Flavor Added" disclosure on their PDP are referred to herein as the "Products."[1]

26

27  _____

28  [1] As detailed in ¶ 30 herein, Plaintiffs' counsel's pre-suit investigation identified the following
Products currently being offered for sale: M&M's Ice Cream Cones, M&M's Ice Cream Cookies

1

4.     The FDA adopted its rule requiring the "Artificial Flavor Added" disclosure after engaging in fact-finding and concluding the presence of artificial flavors in ice cream is material to consumers. The FDA's findings are detailed in this Complaint and, among other things, found that "[c]onsumers quite generally prefer natural over artificial flavorings and desire to know when artificial flavorings are present in ice cream" and thus that "[l]abel statements of the use of artificial flavorings are in the consumer's interest." *See* Exhibit A, Excerpts of 25 Fed.Reg. 7126, p. 2.

5.     Because the presence of artificial flavors in ice cream is material to consumers as the FDA's fact-finding confirmed, an ice cream manufacturer such as Mars stands to improve its position in the market, sell more products and increase its revenue and profits by failing to disclose to consumers that its products contain artificial flavors. This is detrimental to consumers, who, as the FDA's fact-finding confirmed, consider the presence of artificial flavors in ice cream a material part of their purchasing decisions and reasonably rely on the truth and accuracy of products' PDPs when making purchasing decisions.

6.     Defendants' conduct alleged herein is false and misleading and violates both California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law), Cal. Health & Safety Code §§ 109930, 110100 and 110760 and other applicable state laws. Defendants' identical conduct that violates the Sherman Law and other applicable states laws also violates the Federal Food, Drug and Cosmetic Act  ("FDCA") 21 U.S.C. §§ 343(k), (a)(1) and 331(a), and the FDA's ice cream flavor labeling regulation, 21 C.F.R. § 135.110. This identical conduct serves as the sole factual basis of each state law cause of action brought by this Complaint, and Plaintiffs do not seek to enforce any of the state law claims raised herein to impose any standard of conduct that exceeds that which would violate the FDCA and regulations adopted pursuant thereto. Thus, Plaintiffs' state law claims are not preempted by the FDCA because Plaintiffs' claims for state law violations seek to enforce the same standard of conduct required by federal law and Plaintiffs' state law claims are based upon Defendants' breach of that standard of conduct. For any of Plaintiffs' state law causes of action, the

---

and Twix Ice Cream Bars. Plaintiffs reserve the right to amend this Complaint to add additional Products they identify through further investigation and/or discovery.

CLASS ACTION COMPLAINT; Case No.:

1   allegations supporting those causes of action and any forms of relief sought for those state law
2   causes of action, Plaintiffs expressly disclaim any attempt to hold Defendants to a higher standard of
3   conduct than what is required under federal law, and do not seek any form of relief based on conduct
4   exceeding that which is required under federal law.  All state law causes of action asserted in this
5   Complaint, the allegations supporting those state law causes of action asserted herein and any forms
6   of relief sought for those state law causes of action asserted herein shall be read consistent with the
7   limitations set forth in this paragraph.

8        7.     Accordingly, Plaintiffs bring this action on behalf of California consumers to declare
9   Mars' products mislabeled and enjoin Mars from continuing to sell Products in California that
10   violate applicable regulations for ice cream products with artificial flavors, cited herein, and mislead
11   consumers by omitting the mandated "Artificial Flavor Added" disclosure.

12        8.     Plaintiffs seek only declaratory and injunctive relief and attorneys' fees, costs and
13   expenses incurred in obtaining such relief.  Plaintiffs do not seek monetary relief such as damages or
14   restitution on behalf of either themselves or the Class.

15                                      **PARTIES**

16        9.     Plaintiff Linda Cheslow is a natural person and a citizen of the State of California,
17   residing in Sonoma County.  From approximately April 2010 until approximately August 2014, Ms.
18   Cheslow purchased  Mars' M&M's Ice Cream Cookies and Twix Ice Cream Bars, alternating
19   between each product approximately once every other month, from retail stores including Safeway,
20   Raley's, Target,  near her home in Sonoma County.  When purchasing these Products, Ms. Cheslow,
21   like many consumers, reads the Products' PDP on the front of the Products' packaging before
22   making her purchasing decision, but did not closely examine the other panels of the Products,
23   including the ingredients list on the rear panel.  None of the Products Ms. Cheslow purchased
24   contained the FDA-mandated language "Artificial Flavor Added" on the PDPs.  Nor did the
25   Products' PDPs otherwise disclose these Products' ice cream contained artificial flavors. As a result,
26   Ms. Cheslow believed she was purchasing ice cream containing no artificial flavors. Had she known
27   the truth that the Products she purchased contained artificially flavored ice cream, Ms. Cheslow's
28   purchasing decision would have been materially altered in at least one of the following ways: she

3

1   would not have purchased the Products, would have been willing to pay less for the Products she

2   purchased, would have purchased similar products containing ice cream without artificial flavors, or

3   would have purchased a similar product that was less expensive.

4          10.     Plaintiff Mike Xavier is a natural person and a citizen of the State of California,

5   residing in San Francisco County.  Mr. Xavier purchased Mars' M&M's Ice Cream Cones and Twix

6   Ice Cream Bars from retail stores near his home in San Francisco including Safeway, Lucky's,

7   Target, and Walmart.  Mr. Xavier alternated his purchases of these Mars' M&M's Ice Cream Cones

8   and Twix Ice Cream Bars, purchasing one of them every four to five weeks in the period beginning

9   in or about 2013 to the Summer of 2014 period.  When purchasing these Products, Mr. Xavier, like

10  many consumers, reads the Products' PDP on the front of the Products' packaging before making his

11  purchasing decision, but did not closely examine the other panels of the Products, including the

12  ingredients list on the rear panel.  None of the Products Mr. Xavier purchased contained the FDA-

13  mandated language "Artificial Flavor Added" on the PDPs.  Nor did the Products' PDPs otherwise

14  disclose these Products' ice cream contained artificial flavors.  As a result, Mr. Xavier believed he

15  was purchasing ice cream containing no artificial flavors.  Had he known the truth that the Products

16  she purchased contained artificially flavored ice cream, Mr. Xavier's purchasing decision would

17  have been materially altered in at least one of the following ways: he would not have purchased the

18  Products, would have been willing to pay less for the Products he purchased, would have purchased

19  similar products containing ice cream without artificial flavors, or would have purchased a similar

20  product that was less expensive.

21         11.     Defendant Mars Incorporated is a Delaware corporation with its address at 6885 Elm

22  Street, McLean, Virginia 22101.  Mars Incorporated owns the brands used to label, market and sell

23  the Products including M&M's, Twix and Dove.

24         12.     Defendant Mars Chocolate North America, LLC is a Delaware Corporation with its

25  address at 6885 Elm Street, McLean, Virginia 22101.  Mars Chocolate North America, LLC,

26  operates as a subsidiary of Mars, Incorporated.  According to the Products' labeling, Mars Chocolate

27  North America, LLC distributes the Products and also maintains a place of business at Hacketstown,

28  NJ 07840.

4

CLASS ACTION COMPLAINT; Case No.:

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction over the parties, and venue is proper in San Francisco County Superior Court.

14.    This Court has jurisdiction and venue pursuant to California Code of Civil Procedure §§ 395.5 and 410.10 over the claims raised in this Complaint for the following reasons: (i) Mars regularly engages in the sale of food including the Products in San Francisco County and throughout the State of California; (ii) Mars advertises in San Francisco County and throughout the State of California; (iii) a substantial portion of the underlying transactions and events complained of herein occurred, and affected persons and entities, in San Francisco County; and (iv) Plaintiffs are citizens of California, and Plaintiff Xavier resides in and his purchases of the products at issue occurred in San Francisco County.

**THE FDA REQUIRES THAT ICE CREAM LABELS DISCLOSE ARTIFICIAL FLAVORS**

15.    The U.S. Congress passed the Food, Drug and Cosmetic Act ("FDCA"). 21 U.S.C. §§ 301, *et seq.* The FDCA provides a food shall be deemed to be "misbranded" "[i]f it bears or contains any artificial flavoring...unless it bears labeling stating that fact" or "if its labeling is false or misleading in any particular[.]" 21 U.S.C. §§343(k) and (a)(1). The FDCA and California law prohibit selling or distributing misbranded food. 21 U.S.C. § 331(a); Cal. Health & Safety Code § 110760.

16.    The FDCA empowers the FDA to "promulgate regulations fixing and establishing for any food...a reasonable definition and standard of identity[.]" 21 U.S.C. §§ 341 and 371. This statute also provides the FDA "shall, for the purpose of promoting honesty and fair dealing in the interest of consumers, designate the optional ingredients which shall be named on the label." *Id.* California's Sherman Law adopts all food labeling regulations the FDA promulgates pursuant to this authority. Cal. Health & Safety Code §§ 109930 and 110100.

17.    Pursuant to its statutory authority, the FDA promulgated regulations governing when and how labels for ice cream products must disclose artificial flavors. *See* 21 C.F.R. § 135.110.

5

CLASS ACTION COMPLAINT; Case No.:

18. Ice cream containing no artificial flavor must simply be labeled with the words "ice cream" and the name of its characterizing flavor on its PDP[2] (e.g., "Vanilla Ice Cream" or "Chocolate Ice Cream"). 21 C.F.R. §135.110(2)(i). Ice cream containing artificial flavors must bear specific disclosures depending on the nature and type of the artificial flavors. Id.

19. At issue here is the disclosure required when ice cream contains both a natural, predominating characterizing flavor and an artificial flavor simulating it. In such case, the ice cream must disclose the presence of the artificial flavor in two different ways.

20. First, the ice cream must label itself as "flavored" (e.g., "Vanilla Flavored Ice Cream") on the PDP. 21 C.F.R § 135.110(f)(2)(ii). Second, the ice cream must affirmatively disclose the artificial flavor by stating "Artificial Flavor Added" or "Artificial ___ Flavor Added" (e.g., "Artificial Vanilla Flavor Added") wherever the name of the characterizing flavor appears on the label so conspicuously as to be easily seen under customary conditions of purchase. Id., § (f)(3)(i) and (ii). Since the characterizing flavor must appear in the ice cream product's name on its PDP, as a practical matter this regulation requires the "Artificial Flavor Added" statement also appear on the PDP, in addition to appearing anywhere else on the package the characterizing flavor is identified. Id.

**THE FDA, AFTER FACT-FINDING, DETERMINED THE PRESENCE OF ARTIFICIAL FLAVORS IN ICE CREAM IS MATERIAL TO CONSUMERS**

21. Prior to promulgating the regulation presently codified at 21 C.F.R. §135.110, the FDA conducted extensive research and fact-finding. After due notice, the FDA conducted a series of public hearings over a ten year period. Based on evidence received at these hearings, the FDA published proposed conclusions and findings of fact. The FDA considered responses to its proposals, adopting and rejecting some such responses. Thereafter, the FDA promulgated findings of fact "on the basis of reliable, probative and substantial evidence." See Exhibit A, Excerpts of 25 Fed. Reg. 7126, p. 1.

---

[2] The PDP is "the part of a label that is most likely to be displayed, presented, shown, or examined under customary conditions of display for retail sale." 21 C.F.R. § 101.1.

6

CLASS ACTION COMPLAINT; Case No.:

22.     The FDA's findings of fact determined the presence of artificial flavors in ice cream is material to consumers.  The FDA found

> When so used that they do not create a misleading impression as to the presence of a natural ingredient or the amount of a natural ingredient present, artificial food flavorings are suitable ingredients of ice cream.  Consumers quite generally prefer natural over artificial flavorings and desire to know when artificial flavorings are present in ice cream.  To the extent that accurate information can be conveyed to consumers by labeling on ice cream, label statements of the use of artificial flavorings are in the consumer's interest.  Label statements that comply with the requirements of the general provisions of the Federal Food, Drug, and Cosmetic Act are "artificially flavored," "artificial flavoring added," "with added artificial flavoring"
> [ . . .]
> The purpose sought to be served by prescribing the flavoring ingredients was the prevention of misleading labeling.

Exhibit A, p. 2, ¶¶19-20.

23.     Other FDA findings reinforce the materiality of artificial versus natural flavors by finding "[t]he sole purpose for distinguishing between natural and artificial flavors is for economic reasons [and] [i]n most instances, natural flavor is more expensive than artificial flavor."  Exhibit B, Excerpts of 38 Fed. Reg. 33285, p. 2, ¶ 10.

24.     These regulatory findings of fact demonstrate that the mislabeling of artificial flavors in ice cream by the absence of a label statement "show[ing] that artificial flavoring is . . . used" (i.e., "Artificial Flavor Added") "immediately and conspicuously" accompanying the name "Vanilla Flavored Ice Cream" is material to consumers.  21 C.F.R. § 135.110(f)(3)(ii).

## MARS' LABELING OF THE PRODUCTS UNIFORMLY VIOLATES THE FDA'S REGULATIONS

25.     Mars labels each Product "Vanilla *Flavored* Ice Cream," "Coffee *Flavored* Ice Cream" or "Vanilla and Chocolate *Flavored* Ice Cream."  Each Product thus makes the first of the two disclosures the FDA requires when a product contains both a natural, predominating characterizing ice cream flavor and an artificial ice cream flavor simulating it.  *See* ¶¶ 19-20, *supra* (citing 21 C.F.R. § 135.110(f)(2)(ii) (requiring "Flavored" disclosure).  No circumstance other than the presence of a natural, predominating characterizing ice cream flavor and an artificial ice cream flavor simulating it requires Mars to make this "Flavored" disclosure.  Thus, by making the

7

CLASS ACTION COMPLAINT; Case No.:

1 "Flavored" disclosure, Mars admits each Product contains both a natural, predominating
2 characterizing ice cream flavor and an artificial ice cream flavor simulating it.

3     26.    Since Mars admits each Product contains both a natural, predominating characterizing
4 ice cream flavor and an artificial ice cream flavor simulating it, Mars has admitted it is required to
5 make both the "Flavoring" and the "Artificial Flavor Added" disclosures required under such
6 circumstances.[3]  Yet, Mars only makes the first of the two disclosures.  Mars fails to make the
7 second required disclosure because it fails to affirmatively state "Artificial Flavor Added" on the
8 Products' PDPs.  *See* ¶¶ 19-20, *supra* (citing 21 C.F.R. § 135.110(f)(3)(i) (requiring "Artificial
9 Flavor Added" disclosure")).

10     27.    Each Product's labeling misleads consumers and violates FDA regulations, the FDCA
11 and the Sherman Law uniformly because each Product contains both a natural, predominating
12 characterizing ice cream flavor and an artificial ice cream flavor simulating it, yet omits the FDA-
13 mandated "Artificial Flavor Added" disclosure.

14     28.    In addition to uniformly omitting the required "Artificial Flavor Added" disclosure,
15 the Products share uniform characteristics and are marketed as a single product line.  Each Product is
16 one of Mars' chocolate brand products (M&M's, Snickers, etc.,) in the form of an ice cream bar or

---

[3] Alternatively, even if Mars' use of the "Flavoring" disclosure were erroneous or otherwise not due to the presence of a natural, predominating characterizing ice cream flavor and an artificial ice cream flavor simulating it, Mars would still be required to make the "Artificial Flavor Added" disclosure. This is because any artificial flavor not simulating the natural flavor separately and independently triggers the "Artificial Flavor Added" disclosure requirement.  21 C.F.R. § 135.110(f)(3)(i) (requiring "Artificial Flavor Added" disclosure if a food "contains any artificial flavor not simulating the characterizing flavor").  The ingredients list on the rear panel of each of the Products identifies "artificial flavor" as an ingredient in the ice cream of the Products.  Thus, if Mars contends the artificial ice cream flavor in the Products does not simulate the characterizing flavor, Mars' labeling is still unlawful and deceptive as alleged throughout this Complaint.  Similarly, if Mars contends the artificial ice cream flavor in the Products predominates over the natural characterizing flavor, Mars's products would be unlawful and deceptive for failing to make the FDA-mandated artificial flavor disclosure applicable under such circumstances. *See* 21 C.F.R. § 135.110(f)(2)(iii). The only circumstance under which Mars' current labeling would not violate the FDA's artificial ice cream flavor disclosure requirements and mislead consumers would be if Mars added no artificial flavor whatsoever to the Products.

8

CLASS ACTION COMPLAINT; Case No.:

1   similar hand-held novelty.  Mars' promotional materials expressly group the Products as a single

2   product line by, for example, offering a coupon applicable to the entire product line.[4]

3       29.     Each Product's ingredients list on the back of the Product's label confirms the

4   Products contain artificial ice cream flavors.  However, disclosing artificial flavors in the fine print

5   on the back label does not comply with 21 C.F.R. § 135.110(f)(3)(ii), which requires Mars' Products

6   bear the "Artificial Flavor Added" disclosure "immediately and conspicuously preced[ing] or

7   follow[ing]" the Product's name on the PDP.  This back-panel disclosure is thus inadequate to

8   correct the false and misleading omission of the FDA-mandated "Artificial Flavor Added" disclosure

9   on the Products' front labeling.  This is because reasonable consumers typically do not look past

10  misleading representations on the front of packaged food to discover the truth in the ingredient list

11  on the back of the package.   Plaintiffs and other consumers reasonably expect the PDP on the front

12  labels of packaged food to be truthful, accurate and compliant with FDA regulations, and do not

13  scour the back of the product's labeling to verify the accuracy of the front labeling.

14      30.     Mars' Products currently offered for sale include:

15          a.  Mars' M&M's Ice Cream Cones;

16          b.  Mars' M&M's Ice Cream Cookies; and

17          c.  Mars' Twix Ice Cream Bars.

18      31.     Exemplars of each Product's labels are attached hereto as Exhibit C.

19      32.     Mars' M&M's Ice Cream Cookies Product is currently offered for sale in California

20  labeled "Vanilla Flavored Ice Cream."

21      33.     Mars' M&M's Ice Cream Cookies Product is currently offered for sale in California

22  containing artificial flavors in its ice cream.

23      34.     Mars' M&M's Ice Cream Cookies Product is currently offered for sale in California

24  containing both a natural, predominating characterizing ice cream flavor and an artificial ice cream

25  flavor simulating it.

26

27  _____

28  [4] *See*, Exhibit D, Mars Product Line Coupons.

9

CLASS ACTION COMPLAINT; Case No.:

1   35.    Mars' M&M's Ice Cream Cookies Product is currently offered for sale in California

2   bearing labeling that does not disclose "Artificial Flavor Added" immediately and conspicuously

3   adjacent to the statement "Vanilla Flavored Ice Cream."

4   36.    Mars' Twix Ice Cream Bars Product is currently offered for sale in California labeled

5   "Vanilla Flavored Ice Cream."

6   37.    Mars' Twix Ice Cream Bars Product is currently offered for sale in California

7   containing artificial flavors in its ice cream.

8   38.    Mars' Twix Ice Cream Bars Product is currently offered for sale in California

9   containing both a natural, predominating characterizing ice cream flavor and an artificial ice cream

10   flavor simulating it.

11   39.    Mars' Twix Ice Cream Bars Product is currently offered for sale in California bearing

12   labeling that does not disclose "Artificial Flavor Added" immediately and conspicuously adjacent to

13   the statement "Vanilla Flavored Ice Cream."

14   40.    Mars' M&M's Ice Cream Cones Product is currently offered for sale in California

15   labeled "Vanilla Flavored Ice Cream."

16   41.    Mars' M&M's Ice Cream Cones Product is currently offered for sale in California

17   containing artificial flavors in its ice cream.

18   42.    Mars' M&M's Ice Cream Cones Product is currently offered for sale in California

19   containing both a natural, predominating characterizing ice cream flavor and an artificial ice cream

20   flavor simulating it.

21   43.    Mars' M&M's Ice Cream Cones Product is currently offered for sale in California

22   bearing labeling that does not disclose "Artificial Flavor Added" immediately and conspicuously

23   adjacent to the statement "Vanilla Flavored Ice Cream."

24   44.    Additionally, at least some of Mars' Products labels violate 21 C.F.R. § 135.110(f)

25   for the separate and independent reason they fail to include the name of the product (*i.e.*, "Vanilla

26   Flavored Ice Cream") on their PDP at all, instead relegating it to a side panel.  Exhibit C, pp. 1-2,

27   Label for Mars' M&M's Ice Cream Cones Product.

28

CLASS ACTION COMPLAINT; Case No.:

45.    Mars is or reasonably should be aware that the Products' labeling is unlawful, false and misleading as described here.  Besides the applicable FDA regulations which it is required to comply with and thus must be aware of, the International Dairy Foods Association ("IDFA"), an industry organization representing ice cream manufacturers such as Mars, publishes an Ice Cream and Frozen Desserts Labeling Manual specifically addressing the FDA regulations Mars violates.  *See* Exhibit E, Excerpts of Ice Cream and Frozen Desserts Labeling Manual.  The IDFA's manual provides specific examples of FDA-compliant labeling, including the addition of the FDA-mandated "Artificial Flavor Added" declaration adjacent to the "Vanilla Flavored Ice Cream" declaration on the label of ice cream containing both natural vanilla flavor and artificial flavor, with the natural flavor predomination, as Mars' Products do.  Exhibit E, pp. 4-6 (Category II and Illustration 2).

**MARS REFUSED TO CEASE ITS WRONGDOING**

46.    On April 29, 2015, Plaintiff Cheslow notified Mars of the allegations in this Complaint via letter pursuant to the CLRA, Cal. Civ. Code §§ 1750-85.  A copy of Plaintiff's CLRA letter to Mars is attached hereto as Exhibit F.  Mars' agents signed the U.S. mail return receipt forms confirming Mars received Plaintiff's CLRA letter by May 5, 2015.  Exhibit F, pp. 37 and 39.

47.    Plaintiff's CLRA letter put Mars on notice of the allegations of this Complaint and demanded Mars cease selling in California the Products bearing the unlawful, false and misleading labels described herein.

48.    Mars never responded to Plaintiff's CLRA letter.

49.    Although Mars has now had ample notice of Plaintiffs' allegations that its labeling is unlawful, false and misleading as described herein and an opportunity to address Plaintiffs' demands, Mars has failed to do so.

**CLASS ACTION ALLEGATIONS**

50.    This action asserts claims for declaratory and injunctive relief on behalf of a California Class pursuant to Cal. Civ. Proc. Code § 382, defined as:

All California consumers.

51.    Excluded from the Class are: (i) Mars, Incorporated and Mars Chocolate North America, LLC, including any entity in which Mars, Incorporated or Mars Chocolate North America,

11

1   LLC has a controlling interest, is a parent or subsidiary, or which is controlled by Mars, Incorporated

2   or Mars Chocolate North America, LLC as well as their officers, directors, affiliates, legal

3   representatives, heirs, predecessors, successors, and assigns; and (ii) the judges to whom this action

4   is assigned and any members of their immediate families.

5         52.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because

6   Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as

7   would be used to prove those elements in individual actions alleging the same claims.

8                        **A.    The Parties are Numerous and Ascertainable**

9         53.    There are thousands of members of the Class who are geographically dispersed

10  throughout California.  Therefore, individual joinder of the Class members in order to bring them all

11  before the Court is impracticable.

12                       **B.    There is a Well-Defined Community of Interest**

13        54.    In order to determine if there is a well-defined community of interest such that the

14  question is one of a common or general interest, a court should consider: (1) whether common

15  questions of law and facts predominate; (2) whether the class representatives' claims or defenses are

16  typical of the class; and (3) whether the class representatives can adequately represent the class.

17                       **i.    Common Questions of Law and Fact Predominate**

18        55.    Common questions of law or fact exist as to all members of the Class and

19  predominate over any questions affecting only individual members of the Class.  These common

20  legal or factual questions include:

21        a.     Whether Mars continues to offer for sale or make available for sale in California

22  the Products as described herein;

23        b.     Whether Mars' mislabeling of the Products as described herein is unlawful;

24        c.     Whether Mars' mislabeling is material to consumers; and

25        d.     Whether Plaintiffs and members of the Class are entitled to declaratory and

26  injunctive relief.

27

28

CLASS ACTION COMPLAINT; Case No.:

### ii.    Plaintiffs' Claims Are Typical of the Class

56.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs purchased Mars' Products as described in ¶¶ 9-10, *supra*.  Plaintiffs are California consumers who continue to be exposed to Mars' mislabeling.  Therefore, Plaintiffs are no different in any material respect from any other members of the Class, and the relief sought by Plaintiffs is common to the relief sought by the Class.

### iii.    The Class Representatives Can Adequately Represent the Class

57.    Plaintiffs are adequate representatives of the Class because their interests are neither antagonistic to nor in conflict with the interests of the Class members that they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

### C.    A Class Action Is Superior to All Other Available Methods For The Fair And Efficient Adjudication of Plaintiffs' And Class Members' Claims

58.    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  Because this action seeks declaratory and injunctive relief to restrain Mars from selling or making available for sale the mislabeled Products throughout California, this action is only appropriate as a class action because it affects all California consumers by the nature of the relief sought.  It would be virtually impossible for Class members individually to obtain this relief.  Even if members of the Class could afford individual actions, a multitude of such individual actions still would not be preferable to class wide litigation.  Individual actions also present the potential for inconsistent or contradictory judgments, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.

59.    A class action presents far fewer litigation management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The Class may also be certified because Mars acted or refused to act on grounds generally applicable to the Class, thereby making preliminary and final injunctive relief and corresponding declaratory

13

CLASS ACTION COMPLAINT; Case No.:

1 | relief appropriate.   Also in the alternative, the Class may be certified with respect to particular
2 | issues.

**FIRST CAUSE OF ACTION**
**("Unlawful" Business Practices in Violation of the Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

60.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

61.     The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

62.     A business act or practice is "unlawful" if it violates any established state or federal law.

63.     As described throughout this Complaint, Mars' Products' labeling fails to disclose the presence of artificial ice cream flavors through the FDA-mandated "Artificial Flavor Added" statement and is false and misleading.  Mars' conduct thus violated and continues to violate the federal FDCA, 21 U.S.C. §§ 343(k), (a)(1) and 331(a), and the FDA's ice cream flavor labeling regulation, 21 C.F.R. § 135.110.  This identical conduct also violates California's Sherman Law, Cal. Health & Safety Code §§ 109930, 110100 and 110760.

64.     Mars continues to violate the UCL through its ongoing violation of California and federal law as described herein.

65.     As described herein, Mars obtained money from Plaintiffs through its unlawful acts and practices because Plaintiffs purchased Mars' Products relying on the accuracy of the Products' labeling and the accuracy of Mars' Products' labeling was a material part of Plaintiffs' purchasing decisions.  As a result of Mars' alleged conduct, Plaintiffs have lost money.

66.     Accordingly, Plaintiffs request the Court declare Mars' Products' labeling unlawful and enjoin Mars from continuing to violate the UCL by selling or offering for sale the mislabeled Products in California, or causing the mislabeled Products to be sold or offered for sale in California. Unless Mars is permanently enjoined from continuing to engage in such violations of the UCL, future consumers of Mars' Products will be harmed by its acts and practices in the same way as

14

1   Plaintiffs.  Plaintiffs seek only declaratory and injunctive relief and seek no monetary relief, such as

2   damages or restitution, either individually or on behalf of the Class.

3                                   **SECOND CAUSE OF ACTION**
    **("Unfair" Business Practices in Violation of the Unfair Competition Law ("UCL"),**
4                      **Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

5          67.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them

6   as if fully set forth herein.

7          68.     The UCL defines unfair business competition to include any "unlawful, unfair or

8   fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal.

9   Bus. Prof. Code § 17200.

10         69.     As described throughout this Complaint, Mars' Products' labeling fails to disclose the

11  presence of artificial flavors in the ice cream through the FDA-mandated "Artificial Flavor Added"

12  statement and is false and misleading.  Defendant's practices constitute unfair business practices in

13  violation of the UCL because, among other things, they are immoral, unethical, oppressive,

14  unscrupulous or substantially injurious to consumers, and/or any utility of such practices is

15  outweighed by the harm caused to consumers.  Defendant's practices violate the legislative policies

16  of the underlying statutes alleged herein, namely, of protecting consumers and preventing persons

17  from false and misleading advertising.  Defendant's practices caused substantial injury to Plaintiffs

18  and Class members, are not outweighed by any benefits, and Plaintiffs and Class members could not

19  have reasonably avoided their injuries.

20         70.     Mars continues to violate the UCL through its ongoing unfair acts and practices as

21  described herein.

22         71.     As described herein, Mars obtained money from Plaintiffs through its unlawful acts

23  and practices because Plaintiffs purchased Mars' Products relying on the accuracy of the Products'

24  labeling and the accuracy of Mars' Products' labeling was a material part of Plaintiffs' purchasing

25  decisions.  As a result of Mars' alleged conduct, Plaintiffs have lost money.

26         72.     Accordingly, Plaintiffs request the Court declare Mars' Products' labeling unlawful

27  and enjoin Mars from continuing to violate the UCL by selling or offering for sale the mislabeled

28  Products in California, or causing the mislabeled Products to be sold or offered for sale in California.

15

CLASS ACTION COMPLAINT; Case No.:

1    Unless Mars is permanently enjoined from continuing to engage in such violations of the UCL,

2    future consumers of Mars' Products will be harmed by its acts and practices in the same way as

3    Plaintiffs.  Plaintiffs seek only declaratory and injunctive relief and seek no monetary relief, such as

4    damages or restitution, either individually or on behalf of the Class.

5                                    **THIRD CAUSE OF ACTION**
     **("Fraudulent" Business Practices in Violation of the Unfair Competition Law ("UCL"),**
6                        **Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

7         73.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them

8    as if fully set forth herein.

9         74.    The UCL defines unfair business competition to include any "unlawful, unfair or

10   fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal.

11   Bus. Prof. Code § 17200.

12        75.    A business act or practice is "fraudulent" under the UCL if it actually deceives or is

13   likely to deceive members of the consuming public.

14        76.    As described throughout this Complaint, Mars' Products' labeling fails to disclose the

15   presence of artificial ice cream flavors through the FDA-mandated "Artificial Flavor Added"

16   statement and is false and misleading.  As alleged throughout this Complaint, the FDA determined

17   the presence of artificial ice cream flavors is material to consumers.  Thus, omitting the FDA-

18   mandated "Artificial Flavor Added" statement from the Products' PDPs actually deceives and/or is

19   likely to deceive Class members and the consuming public.

20        77.    Mars continues to violate the UCL through its ongoing fraudulent acts and practices

21   as described herein.

22        78.    As described herein, Mars obtained money from Plaintiffs through its unlawful acts

23   and practices because Plaintiffs purchased Mars' Products relying on the accuracy of the Products'

24   labeling and the accuracy of Mars' Products' labeling was a material part of Plaintiffs' purchasing

25   decisions. As a result of Mars' alleged conduct, Plaintiffs have lost money.

26        79.    Accordingly, Plaintiffs request the Court declare Mars' Products' labeling unlawful

27   and enjoin Mars from continuing to violate the UCL by selling or offering for sale the mislabeled

28   Products in California, or causing the mislabeled Products to be sold or offered for sale in California.

16

CLASS ACTION COMPLAINT; Case No.:

1   Unless Mars is permanently enjoined from continuing to engage in such violations of the UCL,

2   future consumers of Mars' Products will be harmed by its acts and practices in the same way as

3   Plaintiffs.  Plaintiffs seek only declaratory and injunctive relief and seek no monetary relief, such as

4   damages or restitution, either individually or on behalf of the Class.

5                                **FOURTH CAUSE OF ACTION**
      **(False Advertising in Violation of the False Advertising Law ("FAL")**
6                        **Cal. Bus. & Prof. Code §§ 17500, *et seq*.)**

7        80.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them

8   as if fully set forth herein.

9        81.    Mars uses advertising on the Products' packaging to sell the Products.  Mars

10  disseminates advertising concerning the Products which by its very nature is deceptive, untrue or

11  misleading within the meaning of the FAL because omitting the FDA-mandated "Artificial Flavor

12  Added" disclosure is misleading, likely to deceive and continues to deceive Class members and the

13  general public as described throughout this Complaint.

14       82.    In making or disseminating the Products' labeling described herein, Mars knew or

15  should have known that the Products' labeling was misleading and acted in violation of the FAL.

16       83.    Mars' material non-disclosures as described throughout this Complaint constitute

17  false and misleading advertising and therefore violate the FAL.

18       84.    As described herein, Mars obtained money from Plaintiffs through its unlawful acts

19  and practices because Plaintiffs purchased Mars' Products relying on the accuracy of the Products'

20  labeling and the accuracy of Mars' Products' labeling was a material part of Plaintiffs' purchasing

21  decisions.  As a result of Mars' alleged conduct, Plaintiffs have lost money.

22       85.    Accordingly, Plaintiffs request the Court declare Mars' Products' labeling unlawful

23  and enjoin Mars from continuing to violate the FAL by selling or offering for sale the mislabeled

24  Products in California, or causing the mislabeled Products to be sold or offered for sale in California.

25  Unless Mars is permanently enjoined from continuing to engage in such violations of the FAL,

26  future consumers of Mars' Products will be harmed by its acts and practices in the same way as

27  Plaintiffs.  Plaintiffs seek only declaratory and injunctive relief and seek no monetary relief, such as

28  damages or restitution, either individually or on behalf of the Class.

                                             17

**FIFTH CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq*.)**

86.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

87.     Plaintiffs and each Class member are "consumers" within the meaning of Civil Code § 1761(d).

88.     Plaintiffs' purchases of Mars' Products are "transactions" within the meaning of Civil Code § 1761(e) and Mars' Products are "goods" within the meaning of Civil Code § 1761(a).

89.     Mars violated and continues to violate the CLRA in at least the following respects:

   a.   in violation of Civil Code § 1770(a)(5), Mars represented that the Products had characteristics or ingredients which they did not have;

   b.   in violation of Civil Code § 1770(a)(7), Mars represented that the Products were of a particular standard, quality or grade, which they were not; and

   c.   in violation of Civil Code § 1770(a)(9), Mars advertised the Products with the intent not to provide what it advertised.

90.     Mars knew or should have known that its Products' mislabeling as alleged throughout this Complaint violated consumer protection laws, and that the Products' mislabeling were material to Plaintiffs and the members of the Class.

91.     As described herein, Mars obtained money from Plaintiffs through its unlawful acts and practices because Plaintiffs purchased Mars' Products relying on the accuracy of the Products' labeling and the accuracy of Mars' Products' labeling was a material part of Plaintiffs' purchasing decisions.

92.     Accordingly, Plaintiffs request the Court declare Mars' Products' labeling unlawful and enjoin Mars from continuing to violate the FAL by selling or offering for sale the mislabeled Products in California, or causing the mislabeled Products to be sold or offered for sale in California. Unless Mars is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Mars' Products will be harmed by its acts and practices in the same way as

18

CLASS ACTION COMPLAINT; Case No.:

1  Plaintiffs.  Plaintiffs seek only declaratory and injunctive relief and seek no monetary relief, such as

2  damages or restitution, either individually or on behalf of the Class.

3        93.    Plaintiffs request this Court award Plaintiffs court costs and attorneys' fees pursuant

4  to the CLRA, Cal.Civ.Code § 1780(e).

5                                  **PRAYER**

6        Plaintiffs, on behalf of themselves and all members of the Class, request that the Court order

7  the following relief and enter judgment against Mars as follows:

8        A.    An order certifying that this action is properly brought and may be maintained as a

9  class action, that Plaintiffs be appointed Class Representatives for the Class and that Plaintiffs'

10  counsel be appointed Class Counsel.

11        B.    An order declaring Mars' mislabeling of the Products as described herein is unlawful.

12        C.    An order enjoining Mars from selling or offering the mislabeled Products for sale in

13  California, or causing the mislabeled Products to be sold or offered for sale in California.

14        D.    An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees

15  and expenses under the CLRA, California Code of Civil Procedure Section 1021.5, or as otherwise

16  provided by law.

17        E.    Such other and further injunctive and/or declaratory relief as may be available as part

18  of the statutory claims asserted herein, or other injunctive and/or declaratory relief as may be

19  deemed necessary or appropriate for any of the claims asserted.

21  DATED:  August 26, 2015           **FINKELSTEIN THOMPSON LLP**

22                                By: _____

23                                Rosemary M. Rivas

24                                Alyssa Dang

25                                One California Street, Suite 900
                                  San Francisco, California 94111

26                                Tel: 415-398-8700/Fax: 415-398-8704

27                                **FEINSTEIN DOYLE PAYNE**
                              **& KRAVEC, LLC**

28                                Joseph N. Kravec, Jr. (*pro hac* to be filed)

19

CLASS ACTION COMPLAINT; Case No.:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McKean J. Evans (*pro hac* to be filed)
429 Forbes Avenue
Allegheny Building, Suite 1705
Pittsburgh, PA 15219
Tel.: (412) 281-8400/Fax: (412) 281-1007

*Counsel for Plaintiffs and the Proposed Class*

20

CLASS ACTION COMPLAINT; Case No.:

## AFFIDAVIT OF ROSEMARY M. RIVAS

I, Rosemary M. Rivas, declare as follows:

1.     I am a partner with the law firm Finkelstein Thompson LLP, one of the law firms representing Plaintiffs Linda Cheslow and Mike Xavier  in this action.  I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California.  This declaration is made pursuant to Cal. Civ. Code § 1780(d).  This affidavit is based on my research of public records and also upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.     Defendants Mars Incoporated and Mars Chocolate North America, LLC conduct business within this County. Specifically, the products at issue are sold in retail stores within this County.

I declare under penalty of perjury under the laws of the United States and State of California this 26th day of August 2015 in San Francisco, California that the foregoing is true and correct.

Rosemary M. Rivas

AFFIDAVIT OF ROSEMARY M. RIVAS; Case No.:

# ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or
> validity of that document.

State of California
County of _____ San Francisco _____ )

On __6/24/15__ before me, __Anita Rivas, Notary__
(insert name and title of the officer)

personally appeared __Rosemary Rivas__,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____   **(Seal)**

ANITA RIVAS
Commission # 2118930
Notary Public - California
San Francisco County
My Comm. Expires Jul 10, 2019

# EXHIBIT A

Case 3:15-cv-04854-CRB   Document 1-2   Filed 09/28/15   Page 26 of 41

# Title 21—FOOD AND DRUGS

**Chapter I—Food and Drug Administration, Department of Health, Education, and Welfare**

SUBCHAPTER B—FOOD AND FOOD PRODUCTS

[Docket Nos. 34, 34(a)]

## PART 20—FROZEN DESSERTS; DEFINITIONS AND STANDARDS OF IDENTITY

**Ice Cream, Ice Milk, Frozen Custard, Sherbet, Water Ices, and Related Foods; Order Establishing Standards of Identity**

In the matter of fixing and establishing definitions and standards of identity for ice cream, frozen custard, ice milk, sherbet, water ices, and related foods.

After due notices published in the FEDERAL REGISTER, public hearings were held in the above-entitled matter in 1942, 1951, and 1952. Based upon evidence received at these hearings, the Commissioner of Food and Drugs, under authority delegated to him by the Secretary of Health, Education, and Welfare, published on March 26, 1958 (23 F.R. 1991) proposed findings of fact, conclusions, and proposed identity standards for these foods. After consideration of the exceptions and written arguments received, some of which were adopted in whole or in part and some of which were rejected, as is shown by marginal notations on the exceptions on file in the office of the Hearing Clerk, the Commissioner, pursuant to the authority provided in the Federal Food, Drug, and Cosmetic Act (secs. 401, 701(e), 52 Stat. 1046, 1055, as amended 70 Stat. 919; 21 U.S.C. 341, 371 (e)), and delegated to him by the Secretary of Health, Education, and Welfare (25 F.R. 8611), and on the basis of reliable, probative, and substantial evidence in the whole record, orders the promulgation of the following findings of fact, conclusions, and definitions and standards of identity for the subject foods.

### FINDINGS OF FACT [1]

1. Ice cream is the common and usual name of the frozen food made from cream or a mixture of milk made from or from a combination of dairy products, with or without water, having substantially an equivalent composition. The food is sweetened with sugar or other suitable sweetening agent and may contain natural or artificial flavoring or other food ingredients, such as cocoa, fruit, and nuts, to characterize it as a kind of ice cream. It may contain small amounts of added salt as seasoning. Substances described in later findings and often referred to as stabilizers are usually added to prevent formation of large ice crystals. Artificial coloring and certain other optional ingredients may be added. (R. 42-46, 82, 231-232, 367, 450, 528-539, 688, 800, 4834.)

2. The usual household practice is to prepare ice cream from sweet cream, a mixture of sweet milk and sweet cream. However, a large portion of commercially produced ice cream is prepared from various dairy products, with or without water, so combined that in composition the mixture closely resembles cream or a mixture of milk and cream (see finding 3). When prepared for freezing, the sweetened dairy ingredient (with other ingredients used and with or without the addition of flavoring or other characterizing ingredient) is known in the trade as ice cream mix. Certain characterizing ingredients such as fruit may be, and frequently are, added while the mix is being frozen. (R. 330-333, 403, 671-672, 699, 1049, 2232, 5326.)

3. Milk and cream are composed of certain proportions of water, milk fat, and other constituents commonly referred to as nonfat milk solids or serum solids. The nonfat milk solids include proteins, milk sugar, various minerals, and certain water-soluble vitamins. The dairy products other than milk and cream (referred to in finding 2) that are used and are suitable for use in making

commercial ice cream contain milk fat or nonfat milk solids or both in varying proportions and may also contain added sweetening agents. Such dairy products are dried cream, concentrated milk, evaporated milk, sweetened condensed milk, superheated condensed whole milk, dried milk, skim milk, concentrated (evaporated or condensed) skim milk, superheated condensed skim milk, sweetened condensed part skim milk, nonfat dry milk, liquid or condensed or dried sweet cream buttermilk (see findings 5), butter and butter oil. (Evidence indicates plastic cream and a soluble product called nonfat milk fat; butter oil include milk fat prepared from milk, cream, or butter. Combinations of two or more of these properties associated by Water is added if necessary. To produce the properties associated by consumers with ice cream, the proportions of the various products used in such combinations are so adjusted that the finished ice cream mix contains substantial amounts of both milk fat and nonfat milk solids. In recent years the proportion of nonfat milk solids to milk fat in ice cream has been separately increased, as compared with the proportion naturally present in cream or milk. The most important and expensive single constituent of ice cream, however, is milk fat, and ice cream is generally thought of as a substantial proportion of this constituent. There is no evidence that any milk or milk product other than cow's milk or a cow's milk product is used in making ice cream. (R. 44, 46, 50, 402, 440, 523-533, 554, 595-597, 721-726, 732, 736, 1101, 4452, 5304, 5452-5491, 5502, 5916, 6697, 6669, 6180, 6196, 6241, 6386, 6602-6604, 6612-6683, 6694-7013.)

4. The fat of milk is sometimes separated from milk or from butter by processes that free. It is almost entirely from moisture and nonfat milk solids. Such fat from butter is usually referred to as butter oil. When prepared directly from milk or cream it may also be called dry butter or dry butterfat. Butter oil is the name commonly used to designate milk fat prepared from butter by processes which fat eliminate moisture

and nonfat milk solids almost completely. Such a product can be prepared directly from milk or cream. (R. 5000, 6040, 6241, 6386, 6452, 6603, 6917, 6933, 7010-7013, 7645-7646, 9754.)

5. A proposal was made to recognize as an optional ingredient of ice cream a product prepared from skim milk by the following process: The acidity of the skim milk is adjusted to about 0.65 percent. Then water is removed until the solids content reaches about 29 percent. To this concentrated skim milk a lactic acid starter is added, and the mixture is held at 70°-72° F. until the acidity reaches 1.5 percent. It is then spray-dried. No satisfactory explanation was given of how a product of such high acidity can be used in ice cream making without causing the ice cream to curdle during pasteurization when the use of the cultured milk powder were to be used in ice cream mix that was neutralized. In experimental batches of ice cream that were neutralized the use of the cultured product was said to offer a means of producing a distinctive culture flavor in ice cream. It cannot be concluded that these manipulations are necessary or desirable or that the use of such a product would promote honesty and fair dealing in the interest of consumer. The abuses that might arise from neutralization of ice cream mixes are neutralized in finding 27. (R. 7158-7180, 7210-7243)

6. Sweet cream buttermilk, in liquid or condensed or dried form, has substantially the same composition as the corresponding serum of skim milk. Careful selection and handling of the product sold as sweet buttermilk are necessary to avoid some degree of sourness. To be suitable for use in ice cream, the product is made from cream churned when it is fresh and sweet. No starter or neutralizer is used, and the resulting buttermilk is promptly used or is promptly evaporated or dried while it is still sweet. Such buttermilk, or the concentrated or dried product mixed with water to a total solids content of 8.5 percent, has a titratable acidity of not more than 0.17 percent, calculated as lactic acid. While there was evidence concerning the desirability of limiting the total bacteria count, this is impracticable at this time. (R. 276-277, 406,

[1] The citations following each finding of fact refer to the pages of the transcript of the testimony and the exhibits received in evidence at the hearing.

Case 3:15-cv-04454-CRB   Document 1-2   Filed 09/28/15   Page 27 of 41

minor protein fractions of the skim milk. The product is prepared by adding mild alkalizing ingredients to skim milk and heating the mixture. Hydrochloric acid is added in an amount sufficient to effect precipitation of the casein fractions. Alkali is then added to the precipitated curd to adjust the pH to approximately 6.6 or 6.7. The product is spray-dried. The resultant powder is said to have extensive water-holding properties. The product appears to be essentially a casein-ate and may properly be classed as sodium caseinate and permitted as an optional ingredient for addition to ice cream mix containing not less than 20 percent total milk solids. (R. 6447-6459, 15600-15657, 15684-15668, 15677-15700)

15. Cheese whey is the product from milk remaining after the removal of most of the fat and casein in the process of cheese making. It may contain some of the enzymatic or other material used for coagulating the casein and is often slightly acid in reaction. Cheese whey in ice cream, ice milk, and sherbet has been reviewed, based largely on some experimental use of a dried cheese whey in replacing part of the nonfat milk solids normally used in preparing ice cream and sherbet. Dried whey is inferior in some respects to the common dairy products used in ice cream or ice milk. Dried cheese whey has had limited commercial testing, and there is no evidence in the record that would indicate that the consumer would expect ice cream or ice milk to contain even limited amounts of this byproduct from cheese-making in substitution for the customary ingredients. Milk solids are less important as characterizing factors in sherbet than in ice cream, and sherbets in which cheese whey has been substituted for skim milk are reported to have desirable properties and to have been used commercially for some time. If cheese whey is used as an optional ingredient in sherbet it would promote honesty and fair dealing in the interest of the consumer for such sherbets to bear informative labeling to properly distinguish them from ordinary fruit sherbets (see finding 52). (R. 5910-5912, 6671-6724, 6729, 6772-6791, 6800-6810, 6825-6829, 6851-6856, 6866-6867, 6887-6892, 6895, 6896, 6903-6904, 7111-7146, 7449-7450, 7646, 9401-9408, 9440-9446, 9557, 9753-9759, 10744, 13856)

16. There was evidence about a product sold under the trade name of Sata-lac and the advantages of using it in ice cream. It was first said to be made by treating skim milk with an alkali to a point where some change occurred in the lactose. The mixture was then neutralized with an acid, concentrated, and dried. Further testimony indicated that this method was changed, and that the skim milk was treated in some other way. The evidence on the composition of this product is contradictory, and the record contains no substantial basis upon which its suitability for use in ice cream can be determined. The sponsors of this product later withdrew their proposal to have it recognized as an optional ingredient. (R. 729, 1428-1503, 1661-1675, 1677-1694, 2719-2720, 2729-2731, 5462-5464, 7313)

17. The sweetening agent most commonly used in ice cream is sugar (sucrose). It is often used in the form of a sugar sirup. Sirups containing various proportions of sugar and invert sugar are sometimes used. The term "liquid sugar" is used in the sugar trade to designate various sirups of the sucrose type and sirups or combinations thereof. Other products that impart sweetness are used and are suitable for such use. These are dextrose or corn sugar, corn sirup or dried corn sirup, glucose sirup or dried glucose sirup, and invert sugar. In the form of paste or sirup. There are some sirups of which the sweetening ingredient is mainly maltose that may be described as "maltose sirup," and these are suitable ingredients for ice cream. Although lactose has little sweetening efficacy in comparison with sucrose, it is occasionally added in small amounts to ice cream having a relatively low content of nonfat milk solids. The amount of lactose that can be used is limited by the solubility of lactose, "which may occur if too much is used. For such use lactose should be considered a sweetening ingredient. It is unnecessary for definitions and standards of identity for ice cream, frozen custard, sherbets, etc., to prescribe rigid specifications for the sweetening ingredients designated by their common names. Additional products that serve the dual purpose of sweetening the ice cream and imparting to it their own characteristic taste and flavor are specified in finding 27. Sweetening ingredients may be used in various com-

binations. (R. 44-45, 407-409, 537, 693, 733, 831, 1126, 1706-1715, 1784-1787, 1799-1803, 1814-1820, 1855-1838, 1845-1846, 1855-1859, 1862, 1882-1887, 1939-1953, 11275-11295, 11312-11324, 11332-11374, 16040-16103, 16114-16116, 16116-16120)

18. Ground spices, ground vanilla beans, infusions of coffee or tea, and a large variety of natural food flavorings, such as extracts of lemon and vanilla, are used as characterizing flavors of ice cream and are suitable for such use. (R. 54-55, 237, 246, 409, 544, 1152, 3032; OP Ex. 3)

19. Various artificial food flavorings are also widely used to modify or characterize the flavor of ice cream. They may be added as such or as components of other ingredients. When so used that they do not create a misleading impression as to the presence of a natural ingredient or the amount of a natural ingredient present, artificial food flavorings are suitable ingredients of ice cream. Consumers quite generally prefer natural over artificial flavorings and desire to know when artificial flavorings are present in ice cream. To the extent that accurate information can be conveyed to consumers by labeling on ice cream, label statements of the use of artificial flavorings are in the consumer's interest. The label statements that comply with the requirements of the general provisions of the Federal Food, Drug, and Cosmetic Act, are "artificially flavored," "artificial flavoring added," "with added artificial flavoring," or, if the artificial flavoring is not added as such but as a component of some other ingredient, the statement "———— artificially flavored," the blank being filled in with the name of such other ingredient. (R. 85-86, 416, 426-428, 1249, 1383-1384, 1391-1394, 1401-1602, 1963-1965, 1968, 1997, 2011-2012, 2903, 5095-5099, 5354, 21324-21326, 21371-21376; Ex. 413)

20. The kind of ice cream now produced in greatest quantity has a flavor derived from one or a combination of the substances vanilla beans and extract of vanilla beans (which are the sources of the flavoring recognized by consumers as "vanilla"), and from artificial flavoring substances such as synthetically produced vanillin, which simulate vanilla flavor. Persons interested in the vanilla bean industry advocated that standards for ice cream

should prescribe the type of flavor used and that for the food with the specified name "vanilla ice cream" the standard should require that only natural flavor from vanilla beans could be used. The notices of the hearing and the preponderance of the evidence as submitted by other persons support establishing a standard for the food "ice cream" and listing the characterizing ingredients and flavorings as optional ingredients. The testimony of the witnesses appearing in behalf of the vanilla bean industry pointed toward prescribing separate specific standards for each of the many kinds of ice cream. Aside from being inadequately supported by the record, regulations setting separate specific standards for the different kinds of ice cream would be more complex and restrictive than a standard listing the characterizing ingredients and flavorings as optional ingredients. The purpose sought to be served by prescribing the flavoring ingredients was the prevention of misleading labeling. It is concluded that a preferable way to achieve this purpose, and one which will promote honesty and fair dealing in the interest of consumers, is to provide, in designating artificial flavoring for label declaration, that where the label names the flavor as "vanilla ice cream" or "vanilla flavored ice cream" no artificial flavor is used, and to provide further that in any ice cream wherein the natural and artificial flavors are used, an express statement made on the label that the ice cream contains vanilla flavoring shall be accompanied immediately and conspicuously by labeling to show that artificial flavoring is also used. (R. 54-55, 237, 538, 540, 1394, 1395, 4451-4452, 4460, 4462-4465, 4468, 4471, 4473, 4479, 4511-4513, 4517, 4521, 4527, 4532-4535, 4653-4658, 4566, 4576, 4687-4591, 4650, 4656, 4661, 4661-4663, 4668, 4710, 4711, 4726, 4730, 4756, 4782, 4799, 4801, 4913-4915, 4916-4917, 4943, 4953, 4971, 4990, 5093-5094, 11101-11110, 11122-11125, 11129-11131, 11137, 15289, 15306, 16319, 15337; Ex. 228-232, 310)

21. Chocolate, various kinds of cocoa, the unpulverized residual material prepared by removing part of the fat from ground cacao beans, or mixtures of any two or more of these substances are used as characterizing ingredients of a kind of ice cream. These cacao ingredients may be added to the ice cream mix as

as prescribed in paragraph (g)(1) of this section, showing the optional ingredients used.

(1) Wherever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase the statements specified in this section, showing the optional ingredients used, shall immediately and conspicuously precede or follow such name without intervening written, printed, or graphic matter.

§ 20.5  Water ices; identity; label statement of optional ingredients.

(a) Water ices are the foods, each of which is prepared by freezing, while stirring, a mix composed of one or more of the optional characterizing fruit ingredients specified in paragraph (b) of this section, sweetened with one or more of the optional sweetening ingredients specified in paragraph (c) of this section. One or more of the optional ingredients specified in paragraph (d) of this section may be used, subject to the conditions hereinafter set forth. The titratable acidity of the finished water ice, calculated as lactic acid, is not less than 0.35 percent. Coloring may be added. The mix, with or without added water, may be seasoned with salt, and may be homogenized. The finished water ice weighs not less than 6 pounds to the gallon.

(b) The optional fruit ingredients referred to in paragraph (a) of this section are any mature fruit or the juice of any mature fruit. The fruit or fruit juice used may be fresh, frozen, canned, concentrated, or partially or wholly dried. The fruit may be thickened with pectin or other of the optional ingredients named in paragraph (d)(1) of this section.

tion subject to the restriction on the total quantity of such substances in water ices prescribed in that paragraph. The fruit is prepared by the removal of pits, seeds, skins, and cores where such removal is usual in preparing that kind of fruit for consumption as fresh fruit. The fruit may be screened, crushed, or otherwise comminuted. It may be subdulated with citric or ascorbic acid. In the case of fruit or fruit juices from which part of the water is removed, substances contributing flavor volatilized during water removal may be condensed and reincorporated in the concentrated fruit or fruit juice. In the case of citrus fruits, the whole fruit, including the peel but excluding the seeds, may be used, and in the case of citrus juice or concentrated citrus juices, cold-pressed citrus oil may be added thereto in an amount not exceeding that which would have been obtained if the whole fruit had been used. The quantity of fruit ingredients used is such that in relation to the weight of the finished water ice, the weight of fruit or fruit juice is the same as the (including water necessary to reconstitute partially or wholly dried fruits or fruit juices to their original moisture content) is not less than 2 percent in the case of citrus ices, and 10 percent in the case of berry ices, and 10 percent in the case of ices prepared with other fruits.

(c) The optional sweetening ingredients referred to in paragraph (a) of this section are: Sugar (sucrose), dextrose, invert sugar (paste or syrup), glucose syrup, dried glucose syrup, corn syrup, dried corn syrup, refined corn syrup, malt extract, dried malt syrup, dried malt extract, maltose syrup, dried maltose syrup.

(d) Other optional ingredients referred to in paragraph (a) of this section are:

(1) Agar-agar, algin (sodium alginate), egg white, gelatin, gum acacia, guar seed gum, gum karaya, locust bean gum, oat gum, gum tragacanth, Irish moss, extract of Irish moss, pectin, psyllium seed husk, sodium carboxymethylcellulose. The total weight of the solids of any such ingredient used singly, or of any combination of two or more such ingredients used (including any such ingredient added separately to the fruit ingredient) is not more than 0.5 percent of the weight of the finished water ice. Such ingredients may be added in admixture with dextrin.

(2) Citric acid, tartaric acid, malic acid, lactic acid, ascorbic acid, or any combination of two or more of these in such quantity as seasons the finished food.

(3) Any natural flavoring.

(4) Any artificial flavoring.

(5) The name of each such water ice is _____ ice," the blank being filled in with the common name of the fruit or fruits from which the fruit ingredient used is obtained. When the names of two or more fruits are included, such names shall appear in the order of predominance, if any, by weight of the respective fruit ingredients used.

(f) Wherever the optional ingredients artificial flavoring, artificial coloring, artificial coloring, or natural flavoring, are used in any such water ice, they shall be named on the labels as follows:

(1) The label shall designate artificial coloring by the statement "artificially colored," "artificial coloring added," "with added artificial coloring," or "_____ an artificial color added," the blank being filled in with the name of the artificial coloring used.

(2) The label shall designate artificial flavoring by the statement "artificially

flavored," "artificial flavoring added," "with added artificial flavoring," or "_____ an artificial flavor added," the blank being filled in with the name of the artificial flavoring used.

(3) The label shall designate natural flavoring "with added flavoring" or "added," "with added flavoring," or "_____ flavoring added," the blank being filled in with the name of the flavoring used.

Label statements may be combined, as for example, "flavoring and artificial coloring added."

(g) Where one or more of the optional ingredients artificial coloring, artificial flavoring, or natural flavoring are used and there appears on the labeling any representation as to the fruit or fruits in the ice, such representation shall be immediately and conspicuously accompanied by appropriate label statements as prescribed in paragraph (f) of this section, showing the optional ingredients used.

(h) Wherever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the statements set out in this section, showing the optional ingredients used, shall immediately and conspicuously precede or follow such name, without intervening written, printed, or graphic matter.

*Effective date.* This order shall become effective 90 days from the date of its publication in the FEDERAL REGISTER.

Dated: July 19, 1960.

[SEAL]     GEO. P. LARRICK,
Commissioner of Food and Drugs.

[F.R. Doc. 60-6979; Filed, July 26, 1960; 8:46 a.m.]

# EXHIBIT B

**RULES AND REGULATIONS**

| | U.S. Federal | For-eign | State and local | Total |
|---|---|---|---|---|
| Current tax expense... | $2,812 | $360 | $400 | $3,072 |
| Deferred tax expense... | 2,238 | 420 | | 2,748 |
| | 4,649 | 780 | 400 | 5,820 |

Deferred tax expense results from timing differences in the recognition of revenue and expense for tax and financial statement purposes. The sources of these differences in 1975 and the tax effect of each were as follows:

| | |
|---|---|
| Excess of tax over book depreciation | $600 |
| Research and development costs expensed on tax return and deferred on books | 1,440 |
| Revenue recognized on completed contract basis on tax return and on percentage of completion basis on books | 960 |
| Tax deductible inventory reserve provided in foreign tax jurisdiction | 420 |
| Warranty cost charged to expense on books but not deductible until paid | (672) |
| | $2,748 |

Total tax expense amounted to $5,820 (an effective rate of 38.8%), a total less than the amount of $7,200 computed by applying the U.S. Federal income tax rate of 48% to income before tax. The reasons for this difference are as follows:

| | Dollar amount | Percent of pretax income |
|---|---|---|
| Computed "expected" tax expense... | $7,200 | 48.0 |
| Increase (reduction) in taxes resulting from: | | |
| Foreign income subject to foreign income tax but not expected to be subject to U.S. tax in foreseeable future ($2,400×48%)−$780=$372... | (372) | (2.5) |
| Tax exempt municipal bond income... | (720) | (4.8) |
| Investment tax credit on assets purchased in 1975... | (700) | (4.7) |
| Goodwill amortization not deductible for tax purposes... | 384 | 2.6 |
| State and local income taxes, net of Federal income tax benefit... | 208 | 1.4 |
| Benefit from income taxed at capital gains rate (1,000 × 48%)−(1,000×30%)=$180... | (180) | (1.2) |
| Actual tax expense... | $5,820 | 38.8 |

[1] Since these amounts are less than 5 percent of the computed "expected" tax expense, they could be combined with any other items less than $360 into an aggregate total. For example, these items could be disclosed as follows: "Miscellaneous items * * * $72 * * * 0.3 percent."
If no single item had exceeded $360 in this case and the total net difference of all items was also less than $360, this reconciliation would not have been required.

Based upon currently anticipated expenditures and operations, it is expected that the deferred income tax balance will be substantially reduced in 1976 and the cash outlay for taxes associated with that year will exceed tax expense by approximately $4,000, primarily due to the book amortization in that year of research and development expense previously deducted for tax purposes.

III. *Computational Guide.* (Furnished only to enable interested parties to determine source of numbers shown in above illustrative note; not to be required of registrants in filings.)

A. Tax computations
Book income before tax $15,000
State income tax (400)

**Permanent differences:**

| | |
|---|---|
| Goodwill amortization | 800 |
| Municipal bond income | (1,500) |
| Foreign income, no domestic income tax | (2,400) |
| Capital gain | (1,000) | (4,100) |
| | 10,900 |

**Timing differences:**

| | |
|---|---|
| Excess depreciation | (1,250) |
| R & D deducted on tax return | (3,000) |
| Warranty cost not deductible until paid | 1,400 |
| Percentage of completion income | (2,000) |
| Taxable income (excluding capital gain) | 6,650 |

Tax to be paid:

| | |
|---|---|
| Tax on ordinary income .48 × 5,650 | 2,712 |
| Plus capital gain tax .30 × 1,000 | 300 |
| Less investment credit | (700) |
| Actual tax paid | 2,312 |

Tax expense per books:

| | |
|---|---|
| Tax expense on ordinary income .48 × 10,300 | 5,049 |
| Plus capital gain tax | 300 |
| Less investment credit | (700) |
| Tax expense—Federal | 4,649 |
| Foreign tax | 780 |
| State and local income tax | 400 |

B. Facts affecting disclosure of net deferred income taxes.
Estimated Changes in Deferred Income Tax Accounts on Balance Sheets:

| | 1974 | 1975 | 1976 |
|---|---|---|---|
| Balance—beginning of year... | $10,000 | $11,000 | $10,500 |
| Additions for timing differences in each year [1]... | 3,000 | 1,500 | 500 |
| Reversals of balances at beginning of each year... | (2,000) | (2,000) | (4,500) |
| Balance—end of year... | 11,000 | 10,500 | 6,500 |

[1] Note: Includes effect of expected expenditures in each subsequent period which give rise to additional tax deferrals.

C. Computations of disclosure items for Rule 3-16(o)
Computed amount, 15,000 × .48 = 7,200.
5% of computed amount, 0.05 × 7,200 = 360.
15% of deferred tax, 0.15 × 2,728 = 409.

[FR Doc.73-25603 Filed 11-28-73; 12:27 pm]

## Title 19—Customs Duties

### CHAPTER I—UNITED STATES CUSTOMS SERVICE, DEPARTMENT OF THE TREASURY

[T.D. 73-325]

### PART 1—GENERAL PROVISIONS

#### Ports of Entry; Greenville, Mississippi

NOVEMBER 21, 1973.

On September 7, 1973, notice of a proposal to extend the port limits of Greenville, Mississippi, in the New Orleans, Louisiana, Customs district (Region V), was published in the FEDERAL REGISTER (38 FR 24374). No comments were received regarding this proposed extension.

Accordingly, by virtue of the authority vested in the President by section 1 of the Act of August 1, 1914, 38 Stat. 623, as amended (19 U.S.C. 2), and delegated to the Secretary of the Treasury by Executive Order No. 10289, September 17, 1951 (3 CFR Ch. II), and pursuant to the authorization provided by Treasury Department Order No. 190, Rev. 9 (38 FR 17517), the port limits of Greenville, Mississippi, in the New Orleans, Louisiana, Customs district (Region V), are

hereby extended to include all of the Washington County, Mississippi.

To reflect this change, the table in section 1.2(o) of the Customs Regulations is amended by substituting "Greenville, Mississippi (including the territory described in T.D. 73-325)[1] for "Greenville, Miss. (T.D. 55697 including the territory described in T.D. 55529)." in the column headed "Ports of entry" in the New Orleans, Louisiana, district (Region V).

(Sec. 1, 37 Stat. 434, sec. 1, 38 Stat. 623, as amended; 19 U.S.C. 1, 2.)

It is desirable to make this extension of the port limits of Greenville, Mississippi, available to the public as soon as possible. Therefore, good cause is found for dispensing with the delayed effective date provision of 19 U.S.C. 553(d).

*Effective date.* This amendment shall be effective December 3, 1973.

[SEAL]        EDWARD L. MORGAN,
*Assistant Secretary
of the Treasury.*

[FR Doc.73-25650 Filed 11-30-73;8:45 am]

## Title 21—Food and Drugs

### CHAPTER I—FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

#### SUBCHAPTER A—GENERAL

### PART 1—REGULATIONS FOR THE ENFORCEMENT OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT AND THE FAIR PACKAGING AND LABELING ACT

#### Food Labeling; Spices, Flavorings, Colorings, and Chemical Preservatives

In the FEDERAL REGISTER of January 19, 1973 (38 FR 2136), the Commissioner of Food and Drugs published a proposal to revise the requirements contained in § 1.12 (21 CFR 1.12) with respect to the labeling of flavor when sold in bulk and when contained in food. A final order on this matter was published in the FEDERAL REGISTER of August 2, 1973 (38 FR 20718).

A number of requests were received for reconsideration or modification of the August 2 order. The Commissioner proposed further modification of that order in the FEDERAL REGISTER of October 5, 1973 (38 FR 27622), and permitted four weeks for comment. Comments were received from a number of organizations, companies, and individuals.

The Commissioner has reviewed all of the comments and petitions submitted with respect to the January 19 and October 5 proposals and the August 2 order, in promulgating the final regulation set out below. The major points that have been made with respect to the August 2 order and the October 5 proposal, and the Commissioner's conclusions, are as follows:

1. Several comments, concurring with the proposal to delete the broad category of "reaction products" from the definition of natural flavor in § 1.12(a)(3), stated that the definition should further be revised to permit products obtained by roasting, heating, or enzymolysis. It was pointed out that such products have traditionally been regarded as natural flavors.

**RULES AND REGULATIONS** 33285

The Commissioner concurs in this comment and the definition has been so revised.

2. Several comments suggested that "other reaction products" should be retained but modified in a way that would not permit the broad construction which led the Commissioner to propose its deletion in the October 5 notice. One comment suggested that "cooking" would be an adequate substitute.

The Commissioner concludes that the addition of "roasting, heating, or enzymolysis" is sufficient to cover flavoring constituents long regarded as natural in origin, and to exclude those, such as vanillin, which are essentially synthetic and result from chemical reactions.

3. One comment requested that the word "fish" be replaced with the broader term "seafood" in the definition of a natural flavor.

This was the intent of the earlier definition, and thus the Commissioner concurs with this comment and has changed the definition accordingly.

4. Comments requested that the term "protein" be added to the term "hydrolysate" in the definition of a natural flavor in order to clarify the intent.

The Commissioner concurs with this comment and has so revised the definition.

5. One comment argued that the definition of artificial color in § 1.12(a)(4) should not include natural substances such as beet juice.

The Commissioner points out that, where beet juice is used to color food in which it is not naturally found, it is being used as an artificial color for those products. Nothing in § 1.12 would prohibit the food manufacturer in those circumstances from declaring the presence of natural beet juice, either on the principal display panel or in the statement of ingredients. Thus, any manufacturer who wishes to use fully informative labeling of this type will be permitted to do so, and no change in the regulation is needed.

6. One comment states that the term "artificial color" in section 403(k) of the Federal Food, Drug, and Cosmetic Act was intended by Congress to apply solely to coal tar colors. The comment admits that there is little legislative history on this point.

The Commissioner concludes that coloring derived other than from the same type of food to which the color is being added is properly characterized as artificial. As already noted, any consumer confusion can readily be avoided by a statement that the product contains the specific natural ingredient involved.

7. Numerous comments indicated widespread failure to understand the relatively limited circumstances under which § 1.12(i) will apply. Several comments reflected the erroneous interpretation that all food must be so labeled with respect to its flavor content.

The Commissioner advises that, if a food makes no direct or indirect representations with respect to flavor, the provisions of § 1.12(i) are inapplicable. In

such circumstances, the presence of artificial or natural flavor, or both, may be declared simply in the statement of ingredients, as permitted by sections 403 (i) and (k) of the act.

8. One comment requested clarification of the circumstances under which a food name would make representations with respect to flavor.

The Commissioner concludes that it is not possible to set out all circumstances under which a flavor representation is or is not implied. Any use of a vignette showing a fruit or vegetable clearly constitutes such a representation. Designation of a soft drink as a "cola" beverage or ginger ale or root beer, or with well-recognized proprietary brand names, does not constitute a flavor representation. On the other hand, use of a specific fruit flavor in the food name, such as "orange soda," does constitute such a representation and requires compliance with § 1.12(i). The Commissioner will provide advisory opinions with respect to specific terminology upon request.

9. One comment suggested that the term "characterizing flavor" referred to in § 1.12(i) should be replaced with the phrase "primary recognizable flavor." This would permit additional use of minor spices without their being declared on the principal display panel.

The Commissioner concurs in this suggestion and the provision has been so revised. It is not intended that individual spices added, for example, to canned foods be required to be separately declared on the principal display panel as part of the name of the food where they are not the primary flavor and are added for garnishment purposes.

10. Comments were submitted that use of the term "artificial" misleads the public into believing that an artificial flavor is in some way inferior to a natural flavor. Comments pointed out that there is no available evidence to indicate any difference in safety or nutritional value between a naturally occurring flavor and its synthetic counterpart.

The Commissioner concurs with the comment that an artificial flavor is no less safe, no less nutritious, and not inherently less desirable, than a natural flavor. The sole purpose for distinguishing between natural and artificial flavors is for economic reasons. In most instances, natural flavor is more expensive than artificial flavor. Where a label creates an impression that a natural flavor is present, the consumer has the right to rely upon that implication or representation.

11. It was suggested that § 1.12(i)(1)(i) should be deleted, on the ground that there is no need to declare the flavor in the name if enough characterizing ingredient is present and natural characterizing flavor is added to enhance or stabilize the flavor of the food.

The Commissioner agrees with this comment and this provision has been deleted. It is unlikely that a food with a characterizing ingredient would also contain added natural characterizing flavor, and in those few instances where this

occurs the consumer will be fully protected since all the characterizing flavor in the product will still be from natural sources.

12. There was comment that a determination whether there is a "sufficient" quantity of a characterizing food ingredient to characterize the food independent of any added natural characterizing flavor involves subjective judgment, and that the distinction between the two situations is so subtle as to have little meaning to the consumer.

The Commissioner recognizes that this determination will in some instances be difficult to make. The difference between a product that contains a characterizing food ingredient and a product that contains no such ingredient, however, is not at all subtle, and is very important to the value of the product and thus to the consuming public.

13. A comment suggested that the term "ingredient" should be substituted for "component" in proposed § 1.12(i)(1)(i) and (ii).

The Commissioner concurs with this comment and final § 1.12(i)(1)(i) has been so revised.

14. Comments pointed out that use of the non-specific term "flavor added" or "flavored" in the proposal is inconsistent with the statement made by the Commissioner in the preamble to his August 2 order that this designation is not meaningful to consumers.

The Commissioner does not agree with this comment. The concern expressed in the preamble to the August 2 order related to the use of the non-specific term "flavored" where part of the characterizing flavor is artificial. The Commissioner has no objection to use of the term "flavored" where all the characterizing flavor is natural in origin.

15. Comments suggested that, in § 1.12(i)(1) and (2), the only important issue is the nature of the characterizing flavor.

The Commissioner concurs with this comment, and has revised these provisions to refer to flavor which "simulates, resembles or reinforces the characterizing flavor." The addition of natural or artificial non-characterizing flavor may properly be designated in the statement of ingredients as such and may include the name of the ingredient(s). For example, in a "chocolate pudding" which contains cocoa and vanillin, it will be unnecessary to state on the principal display panel as the October 5 notice had proposed, that the product contains artificial vanilla flavor. Under the final regulation, this may be stated in the statement of ingredients. Thus, the "except" clause is also deleted from § 1.12(i)(2).

16. Similarly, there was comment that, in proposed § 1.12(i)(1)(iii), there is no need to state on the principal display panel the presence of natural flavor that is not derived from the product whose flavor is simulated.

The Commissioner does not concur in this comment. If there is no flavor whatever from the product whose flavor is simulated, the product is properly labeled

33290

**RULES AND REGULATIONS**

A flavor used shall be required to make such a written certification only where he adds to or combines another flavor with a flavor which has been certified by a flavor supplier as containing no artificial flavor, but otherwise such user may rely upon the supplier's certification and need make no separate certification. All such certifications shall be retained by the certifying party throughout the period in which the flavor is supplied and for a minimum of three years thereafter, and shall be subject to the following conditions:

(i) The certifying party shall make such certifications available upon request at all reasonable hours to any duly authorized officer or employee of the Food and Drug Administration or any other employee acting on behalf of the Secretary of Health, Education, and Welfare. Such certifications are regarded by the Food and Drug Administration as reports to the government and as guarantees or other undertakings within the meaning of section 301(h) of the act and subject the certifying party to the penalties for making any false report to the government under 18 U.S.C. 1001 and any false guarantee or undertaking under section 303(a) of the act. The defenses provided under section 303(c) (2) of the act shall be applicable to the certifications provided for in this section.

(ii) Wherever possible, the Food and Drug Administration shall verify the accuracy of a reasonable number of certifications made pursuant to this section, constituting a representative sample of such certifications, and shall not request all such certifications.

(iii) Where no person authorized to provide such information is reasonably available at the time of inspection, the certifying party shall arrange to have such person and the relevant materials and records ready for verification as soon as practicable; provided that, whenever the Food and Drug Administration has reason to believe that the supplier or user may utilize this period to alter inventories or records, such additional time shall not be permitted. Where such additional time is provided, the Food and Drug Administration may require the certifying party to certify that relevant inventories have not been materially disturbed and relevant records have not been altered or concealed during such period.

(iv) The certifying party shall provide, to an officer or representative duly designated by the Secretary, such qualitative statement of the composition of the flavor or product covered by the certification as may be reasonably expected to enable the Secretary's representatives to determine which relevant raw and finished materials and flavor ingredient records are reasonably necessary to verify the certifications. The examination conducted by the Secretary's representative shall be limited to inspection and review of inventories and ingredient records for those certifications which are to be verified.

(v) Review of flavor ingredient records shall be limited to the qualitative formula

and shall not include the quantitative formula. The person verifying the certifications may make only such notes as are necessary to enable him to verify such certification. Only such notes of such flavor ingredient records as are necessary to verify such certification or to show a potential or actual violation may be removed or transmitted from the certifying party's place of business: *Provided,* That, where such removal or transmittal is necessary for such purposes the relevant records and notes shall be retained as separate documents in Food and Drug Administration files, shall not be copied in other reports, and shall not be disclosed publicly other than in a judicial proceeding brought pursuant to the act or 18 U.S.C. 1001.

*Effective date.*—Labeling may be changed to comply with this regulation beginning December 3, 1973. All labeling ordered for food subject to § 1.12(1) ordered after March 15, 1974, and all labeling used for products shipped in interstate commerce after December 31, 1974, shall comply with this regulation.

(Secs. 402, 403, 409, 701(a), 702, 703, 704, 52 Stat. 1046, 1047, 1048-1049 as amended, 1055, 1055-1057 as amended; 21 U.S.C. 342, 343, 348, 371(a), 372, 373, 374.)

Dated: November 21, 1973.

A. M. SCHMIDT,
*Commissioner of Food and Drugs.*

[FR Doc.73-25529 Filed 11-30-73;8:45 am]

**Title 26—Internal Revenue**

**CHAPTER I—INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY**

**SUBCHAPTER A—INCOME TAX**

[T.D. 7292]

**PART 1—INCOME TAX; TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1953**

**Special Rules for Determining Foreign Tax Credit**

By a notice of proposed rulemaking appearing in the FEDERAL REGISTER for March 23, 1971 (36 FR 5423), amendments to the Income Tax Regulations (26 CFR Part 1) were proposed in order to conform such regulations to changes made by section 10 of the Revenue Act of 1962 (76 Stat. 1002) and section 106 (e) of the Foreign Investors Tax Act of 1966 (80 Stat. 1570), relating to the separate limitation on the foreign tax credit in the case of section 904(f) interest income. A public hearing was not requested, and none was held. After consideration of all such relevant matter as was presented by interested persons regarding the rules proposed, certain changes were made, and the proposed amendments of the regulations, subject to the changes indicated below, are adopted by this document.

In the regulations as proposed it was unclear whether, in determining under § 1.904-4(a)(2)(i) whether interest income is derived from a transaction directly related to the active conduct of a trade or business, a trade or business conducted by a corporation which is affiliated with the taxpayer within the

meaning of section 1504 should be considered. The regulations as adopted make it clear that the exclusion provided by section 904(f)(2)(A) or 904(f)(2)(B) applies only to interest derived from a transaction which is directly related to the active conduct by the taxpayer of a trade or business or derived in the conduct by the taxpayer of a banking, financing or similar business.

The last clause of the last sentence of § 1.904-4(b)(1) in the regulations as proposed has been deleted. The sentence as proposed established the rule that the period of time during which the taxpayer has conducted a trade or business in a foreign country will be considered in determining whether the conduct of such trade or business is the active conduct of a trade or business, particularly if the acquisition of the business was for the purpose of avoiding income tax. The clause relating to the period of time during which the taxpayer has conducted the trade or business has been retained, while the clause relating to the tax-avoidance motive has been deleted. A new sentence has been added at the end of § 1.904(b)(1) to provide that the treatment of a foreign subsidiary as a domestic corporation pursuant to section 1504(d) does not affect the location of the subsidiary's trade or business for purposes of section 904(f).

The rules in § 1.904-4(b)(2)(i) of the proposed regulations relating to the types of transactions which will be considered as being directly related to the active conduct of a trade or business in a foreign country have been made less restrictive. The introductory language of § 1.904-4(b)(2)(i) has been changed to make clear that the list of transactions therein is not considered to be all inclusive. In the regulations as proposed, the language indicated that credit extended by the taxpayer to enable the taxpayer's debtor to purchase the goods or services furnished by the taxpayer would be considered as directly related to the active conduct of the trade or business. The wording has been changed in the final regulations to provide that credit extended to secure an outlet for such goods or services will be considered as directly related to the active conduct of the trade or business. This language covers the situation, for example, where a taxpayer extends credit on arm's length terms to meet the general credit needs of a customer so as to encourage such customer to purchase goods from the taxpayer. Section 1.904-4(b)(2)(i) has also been amended to provide that interest from the short-term investment of excess funds is business related and that interest from sources outside a foreign country may be related to business carried on in that country.

The last sentence of § 1.904-4(b)(2)(iii) has been revised to be more in conformity with § 1.864-4(c)(2)(iii)(b) of the Income Tax Regulations and to make clear that the personnel managing the investment of the asset are not required to be in the same foreign country in which the asset is located.

# EXHIBIT C





A sugar cone filled with vanilla flavored ice cream topped with chocolatey nugget in the bottom of the cone. lots of M&M'S® MINIS candies, with a fudge swirl and a

m&m's® BRAND ice cream cones



# m&m's® ice cream cones

## Melts In Your Mouth and In Your Hand®

That loveable M&M'S® Brand Green Character has really done it this time! Cool, creamy ice cream topped with lots of M&M'S® MINIS Milk Chocolate Candies and rich fudge swirled throughout the ice cream. And as an extra treat - a chocolatey nugget at the bottom of the crisp sugar cone.

### Try M&M'S® Brand Ice Cream Cookies, too!



We value your questions or comments.
Call 1-800-551-0095.
Please save the empty wrapper.



RECYCLABLE



0  47677 20431  7

KEEP DEEP FROZEN





| what's inside... | | | | PER CONE |
|---|---|---|---|---|
| CALORIES | TOTAL FAT | SAT. FAT | SUGARS | SODIUM |
| 240 | 12g | 6g | 22g | 75mg |
| 12%DV | 18%DV | 30%DV | * | 3%DV |

*DVs ARE BASED ON A 2,000 CALORIE DIET.

## Nutrition Facts
Serving Size 1 cone (71g)
Servings Per Container 6

**Amount Per Serving**

| Calories 240 | Calories from Fat 110 |
|---|---|

| | % Daily Value** |
|---|---|
| **Total Fat** 12g | **18%** |
| Saturated Fat 6g | **30%** |
| Trans Fat 0g | |
| **Cholesterol** 15mg | **5%** |
| **Sodium** 75mg | **3%** |
| **Total Carbohydrate** 30g | **10%** |
| Dietary Fiber 1g | **4%** |
| Sugars 22g | |
| **Protein** 3g | |

| Vitamin A 2% | • | Vitamin C * |
|---|---|---|
| Calcium 6% | • | Iron * |

*Contains less than 2% of the Daily Value of these nutrients.
**Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Sat. Fat | Less than | 20g | 25g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

INGREDIENTS: ICE CREAM: SKIM MILK, CREAM, SUGAR, CORN SYRUP, WHEY, MONO AND DIGLYCERIDES, CAROB BEAN GUM, GUAR GUM, CARRAGEENAN, NATURAL AND ARTIFICIAL FLAVOR, ANNATTO EXTRACT (COLOR). COATING: PALM OIL, SUGAR, SKIM MILK, LACTOSE, CHOCOLATE, COCOA POWDER, MILKFAT, MONO AND DIGLYCERIDES, SOY LECITHIN, ARTIFICIAL FLAVOR. CONE: BLEACHED WHEAT FLOUR, SUGAR, PARTIALLY HYDROGENATED SOYBEAN AND/OR COTTONSEED OIL, SALT, SOY LECITHIN, CARAMEL COLOR, ARTIFICIAL FLAVOR. COATED M&M'S® BRAND MINIS™ MILK CHOCOLATE CANDIES: (MILK CHOCOLATE (SUGAR, CHOCOLATE, SKIM MILK, COCOA BUTTER, LACTOSE, MILKFAT, SOY LECITHIN, SALT, ARTIFICIAL FLAVORS), SUGAR, COLORING (INCLUDES BLUE 1 LAKE, RED 40, YELLOW 6, YELLOW 5, BLUE 1, YELLOW 5 LAKE, RED 40 LAKE, YELLOW 6 LAKE, BLUE 2 LAKE, BLUE 2), DEXTRIN, CORN SYRUP, CORNSTARCH). COCOA BUTTER. CHOCOLATE SAUCE: CORN SYRUP, HIGH FRUCTOSE CORN SYRUP, WATER, COCOA POWDER PROCESSED WITH ALKALI, MODIFIED CORN STARCH, SALT, NATURAL FLAVOR.

ALLERGY INFORMATION: CONTAINS MILK, WHEAT AND SOY. MAY CONTAIN PEANUTS.
Distributed by Mars Chocolate North America, LLC
Hackettstown, NJ 07840-1503 USA · Plant Number 17-16
®/TM trademarks ©Mars, Incorporated







# EXHIBIT D





